**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

|  |  |
|---|---|
| IN RE: SHALE OIL ANTITRUST LITIGATION | Case No. 24-3119 (MLG) (LF)<br><br>MDL No. 3119 |
| MAYOR AND CITY COUNCIL OF BALTIMORE,<br><br>     Plaintiff,<br><br>          v.<br><br>PERMIAN RESOURCES CORP. f/k/a CENTENNIAL RESOURCE DEVELOPMENT, INC., CHESAPEAKE ENERGY CORPORATION, CONTINENTAL RESOURCES INC., DIAMONDBACK ENERGY, INC., EOG RESOURCES, INC., HESS CORPORATION, OCCIDENTAL PETROLEUM CORPORATION, PIONEER NATURAL RESOURCES COMPANY,<br><br>     Defendants. | Case No. 24-842<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 5

JURISDICTION AND VENUE ......................................................................... 6

PARTIES ............................................................................................................. 8

  Plaintiff .............................................................................................................. 8

  Defendants ........................................................................................................ 8

  Non-Defendant Co-Conspirators ................................................................... 10

FACTUAL ALLEGATIONS ........................................................................... 11

  I.    BEGINNING IN 2008, U.S. SHALE OIL PRODUCTION DROVE OVERALL
  OUTPUT INCREASES IN U.S. OIL PRODUCTION. .......................................... 12

  II.    THE DEFENDANTS AGREED TO COORDINATE OUTPUT RESTRICTIONS IN
  ALIGNMENT WITH OPEC. ............................................................................. 14

    A.    Beginning in 2014, OPEC and the Defendants launched a price war that drove down
    the price of crude oil. ..................................................................................... 14

    B.    Beginning around 2017, the Defendants and OPEC agreed to end the price war and
    begin coordinating crude oil output. ............................................................... 16

    C.    Additional factors indicate that the Defendants conspired to restrict the production of
    crude oil. ......................................................................................................... 23

      1.    The government findings and investigations concerning the U.S. shale oil industry
      and its executives indicate that the Defendants conspired to restrict crude oil output. .... 23

      2.    The Defendants had a common motive to act as a cartel. ........................................ 24

      3.    The Defendants acted against their economic self-interest. ..................................... 24

      4.    There was a high degree of communication between and among the Defendants and
      their co-conspirators. ........................................................................................... 25

      5.    The Defendants are owned by the same investors, making the U.S. shale oil industry
      even more prone to collusion. ............................................................................... 26

  III.    THE DEFENDANTS' CONSPIRACY TO DRIVE UP THE PRICE OF CRUDE OIL
  VIOLATES THE ANTITRUST LAWS. ............................................................... 29

A.   It is a per se violation of the antitrust laws for the Defendants to collude to drive up the price of crude oil. .................................................................................................... 29

B.   Under a quick look or rule of reason analysis, the Defendants' conduct violates the antitrust laws. ..................................................................................................................... 30

1.   The relevant antitrust markets are the U.S. market for the development, production, and sale of crude oil and the U.S. market for light petroleum products. .......................... 31

2.   The Defendants and their co-conspirators possess market power in the U.S. crude oil market. ............................................................................................................................... 31

3.   The Defendants' conduct has anticompetitive effects, including supra-competitive prices. ............................................................................................................................... 32

4.   The crude oil market is susceptible to the exercise of market power. ...................... 32

5.   The antitrust laws prohibit the Defendants' exchange of current and future output information. ......................................................................................................................... 33

IV.   THE PLAINTIFF WAS INJURED AS A RESULT OF THE DEFENDANTS' CONSPIRACY. .................................................................................................................. 34

CLASS ACTION ALLEGATIONS ................................................................................ 37

CLAIMS FOR RELIEF .................................................................................................. 39

COUNT 1 – SHERMAN ACT ....................................................................................... 39

COUNT 2 – ALABAMA ................................................................................................ 41

COUNTS 3 & 4 – ARIZONA ........................................................................................ 41

COUNT 5 & 6 – CALIFORNIA .................................................................................... 42

COUNTS 7 & 8 – COLORADO .................................................................................... 43

COUNT 9 – CONNECTICUT ........................................................................................ 43

COUNTS 10 & 11 – DISTRICT OF COLUMBIA ....................................................... 44

COUNTS 12 & 13 – FLORIDA ..................................................................................... 45

COUNT 14 – HAWAII ................................................................................................... 45

COUNTS 15 & 16 – ILLINOIS ..................................................................................... 46

COUNT 17 – IOWA ............................................................................................................ 47

COUNT 18 – KANSAS ...................................................................................................... 47

COUNT 19 – MAINE ........................................................................................................ 47

COUNTS 20 & 21 – MARYLAND .................................................................................. 48

COUNTS 22 & 23 – MICHIGAN .................................................................................... 49

COUNTS 24 & 25 – MINNESOTA ................................................................................. 49

COUNT 26 – MISSISSIPPI .............................................................................................. 50

COUNTS 27 & 28 – NEBRASKA ................................................................................... 50

COUNTS 29 & 30 – NEVADA ........................................................................................ 51

COUNTS 31 & 32 – NEW HAMPSHIRE ...................................................................... 52

COUNTS 33 & 34 – NEW MEXICO .............................................................................. 52

COUNT 35 – NEW YORK ............................................................................................... 53

COUNT 36 – NORTH CAROLINA ................................................................................. 53

COUNT 37 – NORTH DAKOTA ..................................................................................... 54

COUNTS 38 & 39 – OREGON ........................................................................................ 54

COUNTS 30 & 41 – RHODE ISLAND ........................................................................... 55

COUNTS 42 & 43 – SOUTH DAKOTA ......................................................................... 56

COUNT 44 – TENNESSEE .............................................................................................. 56

COUNT 45 – UTAH .......................................................................................................... 57

COUNT 46 – VERMONT ................................................................................................. 57

PRAYER FOR RELIEF .................................................................................................... 58

DEMAND FOR JURY TRIAL ........................................................................................ 59

## INTRODUCTION

1.     Shale oil is crude oil produced from petroleum-bearing formations with low permeability that are hydraulically fractured – or "fracked" – to produce oil. This case is about a conspiracy to restrict the production of crude oil by the major U.S. producers of shale oil, their Wall Street investors, the Organization of the Petroleum Exporting Countries ("OPEC"), and certain non-OPEC member countries aligned with OPEC, called "OPEC+."

2.     The Defendants' conspiracy appears to have begun sometime around 2017 and continues to the present day. The purpose and effect of the conspiracy is to inflate the price of crude oil, which is refined to produce petroleum products. Higher oil prices and higher petroleum product prices are leading and have led to higher profits for U.S. producers of shale oil and fatter financial returns for their Wall Street investors.

3.     After an investigation, the U.S. Federal Trade Commission ("FTC") found that Scott Sheffield ("Sheffield"), the former CEO and founder of Defendant Pioneer Natural Resources Company ("Pioneer"), for years "campaigned to organize anticompetitive coordinated output reductions between and among U.S. crude oil producers, and others, including" OPEC and OPEC+. *See* Complaint ¶ 1, *In the Matter of Exxon Mobil Corporation* (May 2024) ("FTC Compl."). The FTC's investigation included the review of Sheffield's private correspondence and public statements, revealing that Sheffield's "goal in recent years at Pioneer has been to align U.S. oil production with OPEC and OPEC+ country output agreements, thereby cementing the cartel's position and sharing in the spoils of its market power." *See* FTC Compl. ¶ 3. Sheffield "held repeated, private conversations with high-ranking OPEC representatives assuring them that Pioneer and its Permian Basin rivals were working hard to keep oil output artificially

low." FTC Compl. ¶ 5 (citing a WhatsApp chat). "This was not a one-off event but rather part of

Mr. Sheffield's sustained and long-running strategy to coordinate output reductions[.]" *Id.* ¶ 6.

4.      The revealed coordination led the FTC to bar Sheffield from joining Exxon

Mobil's board of directors – a term of Exxon's agreement to acquire Pioneer in 2024 – because

the mere act of his joining the board itself violated the antitrust laws. *See* FTC Compl. ¶ 2.

5.      The FTC has since opened a full-scale investigation into the U.S. shale oil

industry, focused on the private communications of industry executives. *See* Mitchell Ferman,

Leah Nylen, and Jennifer Dlouhy, "FTC Eyes Oil Bosses' Texts for Signs of Collusion With

OPEC," *Bloomberg* (July 19, 2024). It has also referred the matter to the U.S. Department of

Justice for a potential criminal prosecution. *See* Liz Hoffman and Gina Chon, "FTC plans to

recommend a possible criminal case against ex-Pioneer CEO," *Semafor* (May 2, 2024).

6.      The Mayor and City Council of Baltimore ("Plaintiff") is a victim of this

conspiracy to limit oil production. The Plaintiff and others similarly situated to it paid more than

they should have for the products crude oil is produced to make: "light petroleum products,"

meaning motor gasoline, distillate fuel (diesel and home heating oil), and jet fuel. The Plaintiff

brings this antitrust lawsuit on its own behalf and on behalf of similarly situated purchasers to

hold the Defendants accountable, reclaim the losses incurred, and obtain injunctive relief that

will end this collusion and reform the market.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to Sections 4

and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337(a).

8.     This Court has jurisdiction over the state law claims (1) under 28 U.S.C. § 1367, because the state law claims are so related to the federal claim that it forms part of the same case or controversy, and (2) under 28 U.S.C. § 1332, because the amount in controversy for the Classes exceeds $5,000,000 and because there are members of the Classes who are citizens of a different state than the Defendants.

9.     The Defendants are subject to personal jurisdiction in this Court under (without limitation): (1) 15 U.S.C. § 22; (2) New Mexico's long-arm statute, N.M. Stat. § 38-1-16; and (3) the conspiracy theory of jurisdiction. Each Defendant was formed in or has its principal place of business in the United States, transacted business throughout the United States, including in this District, and had substantial contacts with the United States, including in this District, and committed overt acts in furtherance of their illegal scheme and conspiracy in the United States. The conspiracy was carried out in substantial part in the United States, and was directed at, and had the intended and actual effect of causing injury to, the Plaintiff and Class members residing in, located in, or doing business in the United States.

10.     The Defendants' activities, and those of their co-conspirators, were within the flow of, and were intended to and did have a substantial effect on, foreign and interstate commerce.

11.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 U.S.C. §§ 1391(b) and (c) because during the class period the Defendants transacted business and had agents in this District, a substantial part of the events or omissions giving rise to these claims occurred in this District, and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

## PARTIES

### Plaintiff

12.     Plaintiff **Mayor and City Council of Baltimore** is an independent city in the State of Maryland. During the relevant time period, the Plaintiff purchased light petroleum products, and it was injured by the illegal conduct described herein by paying more for those products than it would have but for the Defendants' conduct.

### Defendants

13.     Defendant **Permian Resources Corporation**, formerly known as Centennial Resources Development ("Permian"), is a publicly traded Delaware corporation headquartered in Midland, Texas. It is a major producer of crude oil from shale oil formations, largely in the Permian Basin in Texas and New Mexico. Permian sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange.

14.     Defendant **Chesapeake Energy Corporation** ("Chesapeake") is a publicly traded Oklahoma corporation headquartered in Oklahoma City. It is a major producer of crude oil from shale oil formations, with operations in Louisiana and Pennsylvania. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the NASDAQ.

15.     Defendant **Continental Resources Inc.** ("Continental") is a significant producer of crude oil using shale oil formations, with operations in North Dakota, Montana, Oklahoma, Texas, and Wyoming. Continental sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock traded on the New York Stock

Exchange until November 2022, until Harold Hamm, the company's founder, took the company private through a series of transactions involving Omega Acquisition Inc.

16.     Defendant **Diamondback Energy, Inc.** ("Diamondback") is a publicly traded Delaware corporation headquartered in Midland, Texas. It is a major producer of crude oil using shale oil formations in Texas. Diamondback sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the NASDAQ.

17.     Defendant **EOG Resources, Inc.** ("EOG") is a publicly traded Delaware corporation headquartered in Houston, Texas. EOG is a major producer of crude oil from oil shale formations with operations covering North Dakota, Wyoming, Colorado, Oklahoma, Texas, New York, Pennsylvania, and New Mexico. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange.

18.     Defendant **Hess Corporation** ("Hess") is a publicly traded Delaware corporation headquartered in New York, New York. It is a significant producer of crude oil from shale oil formations in North Dakota. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange. In October 2023, Chevron Corporation announced that it would acquire Hess for $53 billion.

19.     Defendant **Occidental Petroleum Corporation** ("Occidental") is a publicly traded Delaware corporation headquartered in Houston, Texas. It is a major producer of crude oil from shale oil formations in Colorado, Texas, and New Mexico. Occidental sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. In August 2019, Occidental acquired Anadarko, another oil and gas producer that conducted shale

operations. Occidental's common stock and warrants to purchase common stock trade on the New York Stock Exchange.

20.     Defendant **Pioneer Natural Resources Company** ("Pioneer") is a significant producer of crude oil from shale oil formations. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. In 2024, the Exxon Mobil Corporation ("Exxon") acquired Pioneer, and it is now a wholly owned subsidiary of Exxon. Pioneer generates annual revenues of nearly $20 billion. *See* U.S. Federal Trade Commission, "Analysis of Agreement Containing Consent Order to Aid Public Comment," *In the Matter of Exxon Mobil Corporation*, 89 Fed. Reg. 42875-02 (May 16, 2024). "Exxon is a public, multi-national, vertically integrated oil and gas producer and refiner with operations in the United States and worldwide." Headquartered in Spring, Texas, Exxon "operates refineries throughout the world that produce transportation fuels and petrochemicals." *See* FTC Compl. ¶ 10. Pioneer's CEO for much of the period of the events giving rise to this Complaint was Scott Sheffield.

### Non-Defendant Co-Conspirators

21.     The **Organization of the Petroleum Exporting Countries ("OPEC")** was created in 1960 and its purpose is "to 'coordinate and unify the petroleum policies of its Member Countries and ensure the stabilization of oil markets.'" OPEC's 13 member nations are (1) Saudi Arabia, (2) Iran, (3) Iraq, (4) Kuwait, (5) Venezuela, (6) Indonesia, (7) Libya, (8) UAE, (9) Algeria, (10) Nigeria, (11) Equatorial Guinea, (12) Congo, and (13) Angola. *See* FTC Compl. ¶ 20. OPEC nations control nearly 80% of the world's proven crude oil reserves and close to 40% of the world's oil production. Historically, OPEC exerted market power over global oil prices by

coordinating its members' respective production levels. By increasing or decreasing production levels, OPEC effectively controls prices.

22.     **OPEC+** represents ten additional countries, including Russia, Mexico, and Kazakhstan, that affiliated with OPEC in 2016 to form "OPEC+." *See* FTC Compl. ¶ 20. "OPEC and OPEC+ countries agree on crude oil production levels at a country-level basis to coordinate and limit their collective output. OPEC and OPEC+ account for over 50% of global crude oil production." FTC Compl. ¶ 21.

23.     The **Wall Street Investor Co-Conspirators** are a group of investors who were significant shareholders of the Defendants who met amongst themselves, with the Defendants, and with OPEC representatives beginning in approximately 2017 to work towards an understanding of shale oil output reductions by the Defendants, so as to prop up the price of oil and light petroleum products. Without discovery, the Plaintiff is not able to identify the precise members of the Wall Street Investor Co-Conspirators.

24.     Reference to any Defendant or non-defendant co-conspirator refers to and includes its predecessors, successors, parents, wholly owned or controlled subsidiaries or affiliates, employees, officers, and agents.

## FACTUAL ALLEGATIONS

25.     The factual allegations that follow are based on an investigation drawing on a broad array of public information. For allegations that quote or paraphrase directly from a publicly available document, the Complaint typically cites the source. Much of the Defendants' conduct occurred in closed-door meetings and via private communications. *E.g.*, Ron Bousso,

*"*Exclusive - Saudis tell U.S. oil: OPEC won't extend cuts to offset shale – sources," *Reuters*

(March 9, 2017) (discussing closed-door meetings).

## I.     BEGINNING IN 2008, U.S. SHALE OIL PRODUCTION DROVE OVERALL OUTPUT INCREASES IN U.S. OIL PRODUCTION.

26.     Crude oil is, without question, an immensely important commodity in the modern

world. Refineries process crude oil into refined petroleum products, including heating oils,

gasoline, diesel and jet fuels, lubricants, asphalt, ethane, propane, butane, and other products

used for their energy or chemical content. The overwhelming majority of refinery output in the

United States (around 80%) is "light petroleum products," meaning motor gasoline, distillate fuel

(diesel and home heating oil), and jet fuel. *See* Federal Trade Commission Bureau of Economics,

"The Petroleum Industry: Mergers, Structural Change, and Antitrust Enforcement," at 179 (Aug.

2004).

27.     From the 1980s until approximately 2008, U.S. oil production had been falling

steadily until the development and advancement of hydraulic fracturing (fracking) and horizontal

drilling technologies drove substantial growth in U.S. oil production. *See* Congressional

Research Services, "The World Oil Market and U.S. Policy: Background and Select Issues for

Congress," at 2 (April 23, 2019).

28.     The process of producing crude oil from shale formations first involves drilling

vertical wells several miles deep into a shale formation, and then turning the drill bit to drill

horizontally. Afterwards, water, sand, and chemicals are pumped underground under high

pressure – this part of the process is called "fracking" – to fracture the shale and release oil from

the shale rock.

29.     In general, the advancement of fracking and its related processes allowed the U.S. to vastly increase its total oil production output: in 2008, U.S. total oil production had fallen to 6.8 million barrels, but between 2008 and 2015, U.S. output grew to approximately 12.8 million barrels a day – and by 2019, "it had surged to 17.1 million barrels a day, transforming the U.S. into the world's largest producer, ahead of Saudi Arabia and Russia." *See* Javier Blas, "Wall Street Is Finally Going to Make Money Off the Permian," *Bloomberg* (April 24, 2023). In 2023, shale oil was almost two-thirds of the total crude oil produced in the United States. *See* U.S. Energy Information Administration, "How Much Shale (Tight) Oil is Produced in the United States?" (March 28, 2024).

30.     Leading the growth in U.S. oil production were independent oil producers – called "independents" – who used fracking to explore, develop, and produce shale oil. Independents have historically been distinct from the "supermajors," the large vertically integrated energy companies like Chevron and Exxon.

31.     One of the Defendants' CEOs – Howard Hamm, of Continental – dubbed the group of independents "Cowboyistan," representing "a make-believe republic of oil roughly encompassing the newly tapped fracking regions of North Dakota, Oklahoma and Texas." Due to the development and advancement of fracking and the corresponding increased growth in oil output, Cowboyistan became the seventh largest oil producer in the world, more than Iran and the United Arab Emirates. *See* Christopher Helman, "Welcome To Cowboyistan: Fracking King Harold Hamm's Plan For U.S. Domination of Global Oil," *Forbes* (March 9, 2015).

32.     The independents have historically acted as "swing" producers, meaning they have the ability to adjust their oil production levels rapidly in response to changes in market

conditions to "swing" the price of crude oil. Generally speaking, a major component of the independents' business model has involved taking advantage of high crude oil prices by rapidly expanding production and capturing market share.

## II.   THE DEFENDANTS AGREED TO COORDINATE OUTPUT RESTRICTIONS IN ALIGNMENT WITH OPEC.

33.    OPEC nations control nearly 80% of the world's proven crude oil reserves and close to 40% of the world's oil production. Historically, OPEC exerted market power over global oil prices by coordinating its members' respective production levels. By increasing or decreasing production levels, OPEC effectively controlled prices. Ten additional countries, including Russia, affiliated with OPEC in 2016 to form "OPEC+." *See* FTC Compl. ¶ 20. "OPEC and OPEC+ countries agree on crude oil production levels at a country-level basis to coordinate and limit their collective output. OPEC and OPEC+ account for over 50% of global crude oil production." FTC Compl. ¶ 21.

### A.    Beginning in 2014, OPEC and the Defendants launched a price war that drove down the price of crude oil.

34.    Faced with new and significant competition in oil production from the Defendants, OPEC beginning in approximately 2014 launched a price war. It "flood[ed] the market with oil in a bid to drive out U.S. producers, who were enjoying surging production as improvements in hydraulic fracturing brought on the so-called 'shale boom.'" *See* Liz Hampton, "As oil prices soar, U.S. shale, OPEC in no rush to resume price war," *Reuters* (March 10, 2022). Oil prices plunged to a low of $27 per barrel. *See* Ernest Scheyder and Ron Bousso, "U.S. shale and OPEC share steak in uneasy truce at Houston dinner," *Reuters* (March 6, 2018).

35.     The price war took its toll. OPEC member countries rely on oil production to fuel their economies and government budgets, and so they are sensitive to major and extended price changes. For example, crude oil sales account for roughly 80% of Saudi Arabia's revenues and 75% of Nigeria's budget (Nigeria is Africa's largest oil producer). *See* Radmilla Sulemanova, "Can Saudi Arabia really afford to wage an oil price war?" *Al Jazeera* (March 15, 2020); Shaun Walker et al., "Recession, retrenchment, revolution? Impact of low crude prices on oil powers," *The Guardian* (Dec. 30, 2015). Oil prices that are too low for too long place considerable pressure on these oil producing countries; falling oil prices were, for example, one of the main causes of the collapse of the Soviet Union's economy. *See* Shaun Walker et al., "Recession, retrenchment, revolution? Impact of low crude prices on oil powers," *The Guardian* (Dec. 30, 2015).

36.     The price war was expensive for the Defendants, too. It caused the U.S. energy industry to lay off workers, and institutional investors in U.S. shale oil companies began to pull back. *See* Shaun Walker et al., "Recession, retrenchment, revolution? Impact of low crude prices on oil powers," *The Guardian* (Dec. 30, 2015). In response to the economic pressures of the price war, certain Wall Street investors who had significant equity stakes in the Defendants started to pressure the Defendants to stop competing with OPEC.

37.     But the increased competition in production from OPEC also caused the Defendants to innovate and cut costs. They created new methods to produce shale oil with lower costs, thus enabling them to profitably continue competing with OPEC. *See* Ernest Scheyder and Ron Bousso, "U.S. shale and OPEC share steak in uneasy truce at Houston dinner," *Reuters* (March 6, 2018).

**B.    Beginning around 2017, the Defendants and OPEC agreed to end the price war and begin coordinating crude oil output.**

38.    On November 30, 2016, in an effort to stabilize declining oil prices, OPEC announced an agreement that 11 of its 13 then-active members would reduce oil production by approximately 1.2 million barrels per day for six months, starting January 1, 2017. *See* Congressional Research Service, "OPEC and Non-OPEC Crude Oil Production Agreement: Compliance Status," at 1 (Nov. 16, 2017).

39.    By December 10, 2016, Russia and 10 other non-OPEC countries announced they were joining the agreement, pledging in a "Declaration of Cooperation" to reduce oil production by 558,000 barrels per day. *Id.* OPEC's goal was to push oil to $60 a barrel. *See* Laurence Arnold, "Why OPEC's Breakthrough Might Be Short-Lived: QuickTake Q&A," *Bloomberg* (Dec. 1, 2016).

40.    The cut benefitted the Defendants. The reduction in supply meant that oil prices started to creep up, and the Defendants could continue producing shale oil and seizing market share from OPEC while benefitting from growing prices. *See* Ron Bousso, *"Exclusive - Saudis tell U.S. oil: OPEC won't extend cuts to offset shale – sources,"* *Reuters* (March 9, 2017).

41.    Believing that cutting its own production and the production of the OPEC+ countries would not be enough to cause oil prices to rise to the levels they preferred, and further recognizing that the Defendants were free-riding on the OPEC and OPEC+ production cuts, OPEC approached its new competition – the Defendants and their investors – in an effort to reach an understanding on output.

42.    This was unprecedented. OPEC is a "cartel . . . composed of sovereign nation members, but shale oil producers are American private companies, making it harder for OPEC to

have intergovernmental contact with the U.S. shale sector." *See* Handan Kazanci and Baris

Saglam, "OPEC, US shale producers to continue dialogue," *Anadolu Agency* (July 12, 2017).

43.     Notwithstanding its unprecedented nature, OPEC's Secretary General Mohammed

Barkindo ("Barkindo") in March 2017 "broke[] the ice in reaching out to shale producers in the

U.S." *See* Handan Kazanci and Baris Saglam, "OPEC, US shale producers to continue dialogue,"

*Anadolu Agency* (July 12, 2017).

44.     Barkindo's reach-out achieved its goal. Barkindo stated that OPEC and the U.S.

shale oil producers were beginning to "understand" each other: "we are all agreed that we belong

to the same oil market" and "that we share responsibility in this market." *Id.* The same month,

Sheffield encouraged OPEC to continue its output reduction, warning that "[o]il prices will

tumble to $40 a barrel if OPEC doesn't extend its pact later this year to cut output." *See* David

Wethe, "Oil to Hit $40 If OPEC Fails to Expand Cuts, Pioneer Says," *Bloomberg* (March 8,

2017).

45.     Some of the communications between OPEC and the Defendants were in off-the-

record meetings. Some of these meetings were later called the "North American Independents

Forum."

46.     In **March 2017**, for example, OPEC's Barkindo had dinner with approximately

20 U.S. shale oil executives, where the parties discussed how "the market should be better

balanced," how "lower inventories would be beneficial to everyone," "what supplies the different

members have themselves," and "whether inventories are falling." *See* Javier Blas, "OPEC Said

to Break Bread With Shale in Rare Show of Détente," *Bloomberg* (March 7, 2017); David

Wethe, "Oil to Hit $40 If OPEC Fails to Expand Cuts, Pioneer Says," *Bloomberg* (March 8, 2017).

47.     Senior Saudi Arabian energy officials were more blunt, telling the Defendants in the "closed-door meeting" that they would not let the U.S. shale oil producers "free ride[]" on OPEC and OPEC+'s production cuts by continuing to extend the production cuts. *See* Ron Bousso, *"*Exclusive - Saudis tell U.S. oil: OPEC won't extend cuts to offset shale – sources," *Reuters* (March 9, 2017).

48.     The dinner was in addition to meetings between OPEC, U.S. shale oil producers, and – importantly – hedge funds and institutional investors (the Wall Street Investor Co-Conspirators), who had "become major equity financiers of young U.S. oil firms and in some cases owners of production assets in expanding basins including the Permian in West Texas." *See* Liz Hampton and Marianna Parraga, "CERAWeek – OPEC invites U.S. shale firms, hedge funds into talks on glut," *Reuters* (March 7, 2017). The Wall Street Investor Co-Conspirators met amongst themselves as well. In September 2017, twelve major shareholders representing nearly 5% of shares in the 20 largest U.S. shale oil companies (which includes the Defendant U.S. Shale Oil Producers) met in New York "to discuss a common goal": "how to make frackers pump less and profit more." *See* Bradley Olson and Lynn Cook, "Wall Street Tells Frackers to Stop Counting Barrels, Start Making Profits," *The Wall Street Journal* (Dec. 13, 2017).

49.     In **February 2018**, OPEC held another dinner in Houston "with U.S. shale firms," "the latest sign of the producer group widening talks about how best to tame a global oil glut." *See* Alex Lawler and Ernest Scheyder, "OPEC to meet with U.S. shale firms in Houston on Monday – sources," *Reuters* (Feb. 27, 2018). The chief executive of one shale company

anonymously said that "[w]e now have a seat at the table on pricing." *Id.* After the dinner,

Barkindo confirmed that he "was not worried about further US production growth this year." *See*

"Houston, we see more optimism," *OPEC bulletin*, at 24 (March 2018).

50.     Equatorial Guinea's petroleum minister, Gabriel Mbaga Obiang Lima, told a

journalist that "[t]he key thing is that information is shared about our projections," and "[t]he

important thing is to know how much they (shale) are investing and their projections because

usually they have good statistics." *See* Ernest Scheyder and Ron Bousso, "U.S. shale and OPEC

share steak in uneasy truce at Houston dinner," *Reuters* (March 6, 2018).

51.     The Defendants started to fall in line. Later in 2018, Sheffield stated on a panel

that "[t]hey [OPEC] need to put together some kind of deal to phase into the market. None of us

want $80 (per barrel) to $100 oil, that's too high. There's a sweet spot between $60 and $80[.]"

*See* Ernest Scheyder, "U.S. shale executive pushes OPEC to gradually boost output," *Reuters*

(June 20, 2018). Mr. Hamm (of Continental) attended a Saudi Aramco board meeting in May

2018 and began asking "fellow shale producers to focus more on profitability and less on

profligate production." *See* Ernest Scheyder, *"Continental Resources CEO Harold Hamm pulls

out of OPEC meeting," Reuters* (June 18, 2018).

52.     The March 2018 dinner was supplemented by another dinner between OPEC

representatives and major investors in U.S. shale firms. *See* Alex Lawler and Ernest Scheyder,

"OPEC to meet with U.S. shale firms in Houston on Monday – sources," *Reuters* (Feb. 27,

2018). Barkindo stated that OPEC's meetings with "financial market participants including

hedge funds and oil managers are also the continuation of the meeting [with shale producers] we

[OPEC] had last year at CERAWeek. Before that, we met in New York[.]" *See* "World: OPEC and shale producers are interested in further dialogue," *Thai News Service* (March 7, 2018).

53.     In **March 2019**, OPEC and the Defendants had yet another meeting, described by Diamondback CEO Travis Stice as an "open dialogue on some of the things that are going on in the US shale revolution, US oil production." *See* "O[PEC] sits down to dinner with shale adversaries in Texas," *The Business Times* (March 12, 2019); Javier Blas and Rachel Adams-Heard, "OPEC Splits Avocado Appetizer With Shale Adversaries in Texas," *Bloomberg* (March 12, 2019).

54.     The event had "become an informal communication channel between the cartel and fast-growing shale producers." *See* "OPEC to break bread with shale competitors for third year," *The Business Times* (March 12, 2019). The communications were again complemented by meetings "behind closed doors" between "OPEC officials and some of the leading lights of American finance[.]" *Id.*

55.     By **2020**, OPEC had thoroughly changed its tune on the Defendants. Barkindo touted that he was "able to reach out to the US independents and we had established a line of communication with them," that OPEC had "no objective whatsoever from us as a group or as individual countries to drive US shale production out of business," and that "[i]t is not in [OPEC'S] interest to do that." *See* "OPEC Secretary General: No objective to drive US shale out of business," *Oil & Gas Journal* (July 9, 2020) (quoting Barkindo).

56.     By **2021**, with the pandemic-triggered fall in oil demand ending, oil prices were rising to their highest level in more than two years. The conspiracy began to take hold. The Defendants, consistent with the understandings they reached with OPEC, "added only a limited

number of extra rigs and production, opting to push for higher prices and profits instead," and prices rose "mostly because of the declining responsiveness of the shale sector, rather than official production restraint from OPEC and its allies in the wider OPEC+ exporters group." *See* John Kemp, "U.S. shale restraint pushes oil prices to multi-year high," *Reuters* (June 4, 2021). As oil prices trended towards $75 per barrel, the Defendants kept "their pledges to hold the line on spending and keep output flat, a departure from previous boom cycles. This year's run up in crude prices, and oil output curbs imposed by the OPEC+ producers group, historically would have triggered a drilling boom." *See* Liz Hampton, "U.S. shale industry tempers output even as oil price jumps," *Reuters* (June 28, 2021).

57.     Sheffield confirmed that U.S. shale oil producers would stay "disciplined, regardless whether it's $75 Brent, $80 Brent, or $100 Brent," and he warned that "[a]ll the shareholders that I've talked to said that if anybody goes back to growth, they will punish those companies." *See* Derek Brower and David Sheppard, "US shale drillers cannot contain oil price rise, Pioneer boss says," *Financial Times* (Oct. 3, 2021). By October 2021, benchmark U.S. crude futures traded above $73 a barrel, the highest since October 2018 – and while the price of oil trended upward, the number of U.S. rigs drilling trended downward: there were over 1,000 U.S. rigs drilling in 2018, but there were approximately 470 by October 2021. *Id.*

58.     In **March 2022**, the Defendants and OPEC again met in a private room at a restaurant in Houston, Texas. A sign of how the days of bitter competition were behind them, the Defendants presented Barkindo with a bottle labeled "Genuine Barnett Shale," from the oilfield that launched the U.S. shale revolution. *See* Liz Hampton, "As oil prices soar, U.S. shale, OPEC in no rush to resume price war," *Reuters* (March 10, 2022). In remarks at the dinner, OPEC's

Barkindo said "[w]e have more that binds us together and so we need to work together to exploit that relationship." *See* "OPEC meets with U.S. shale executives as oil prices skyrocket," *Al Arabiya* (March 9, 2022).

59.    In **March 2023**, OPEC officials met again with the Defendants' executives during a private meeting where the parties discussed "how shale producers were focused on delivering profits to shareholders instead of pouring more cash into new drilling," *i.e.*, instead of increasing output. *See* Liz Hampton and Arathy Somasekhar, "OPEC meets with U.S. shale executives as oil prices skyrocket," *Reuters* (March 7, 2022).

60.    The conspiracy worked. Crude prices headed towards record highs of $100 per barrel. While those types of prices would "typically . . . spark a frenzy of new drilling by independent explorers in shale fields from the desert Southwest to the Upper Great Plains," Pioneer and Continental and others instead each acted against their economic self-interest to seize market share from OPEC and instead "pledged to limit 2022 production increases to no more than 5%, a fraction of the 20% or higher annual growth rates meted out in the pre-pandemic era." *See* Kevin Crowley and David Wethe, "Not Even $200 a Barrel: Shale Giants Swear They Won't Drill More," *Bloomberg* (Feb. 18, 2022). EOG similarly said it would limit its increase in crude production to 3.6%. *See* Kevin Crowley, "EOG Holds Back Oil-Production Growth in Line With Shale Peers," *Bloomberg* (Feb. 24, 2022). Goldman Sachs reported that while "U.S. publicly listed shale companies reinvested the equivalent of 120% of their operating cash flow into new wells in 2012," "[t]en years later, that rate plunged to 40%." *See* Javier Blas, "Wall Street Is Finally Going to Make Money Off the Permian," *Bloomberg* (April 24, 2023).

**C.     Additional factors indicate that the Defendants conspired to restrict the production of crude oil.**

61.     Several additional factors strengthen the conclusion that the Defendants agreed to restrict the production of crude oil.

**1.     The government findings and investigations concerning the U.S. shale oil industry and its executives indicate that the Defendants conspired to restrict crude oil output.**

62.     As noted above, the FTC – citing many of the facts discussed above, plus private facts unknown to the Plaintiff – found that Sheffield for years "campaigned to organize anticompetitive coordinated output reductions between and among U.S. crude oil producers, and others, including" OPEC and OPEC+. *See* FTC Compl. ¶ 1. Rather than compete against OPEC and OPEC+ through independent competitive decision-making, "Mr. Sheffield's goal in recent years at Pioneer has been to align U.S. oil production with OPEC and OPEC+ country output agreements, thereby cementing the cartel's position and sharing in the spoils of its market power." U.S. Federal Trade Commission, "Analysis of Agreement Containing Consent Order to Aid Public Comment," *In the Matter of Exxon Mobil Corporation*, 89 Fed. Reg. 42875-02 (May 16, 2024).

63.     As a result of its investigation, the FTC barred Sheffield from serving on Exxon's board – a condition of its acquisition of Pioneer. The FTC found that "giving Mr. Sheffield a larger and more powerful platform—as well as decision-making influence over and access to competitively sensitive information of the largest multinational supermajor oil company and the largest producer in the Permian Basin— . . . would increase the likelihood of anticompetitive coordination amongst crude oil producers and likely make *existing* coordination more effective." FTC Compl. ¶ 7 (emphasis added).

64.     What the FTC found in its investigation of Sheffield's private and public communications prompted it to refer the matter to the U.S. Department of Justice for criminal prosecution. *See* Liz Hoffman and Gina Chon, "FTC plans to recommend a possible criminal case against ex-Pioneer CEO," *Semafor* (May 2, 2024).

65.     In parallel with the criminal referral, the FTC opened its own civil investigation into "whether executives at major oil companies including Hess Corp., Occidental Petroleum Corp. and Diamondback Energy Inc. improperly communicated with OPEC officials," like Sheffield did. *See* Mitchell Ferman, Leah Nylen, and Jennifer Dlouhy, "FTC Eyes Oil Bosses' Texts for Signs of Collusion With OPEC," *Bloomberg* (July 19, 2024).

### 2.     The Defendants had a common motive to act as a cartel.

66.     Similar to how OPEC and OPEC+ members have an incentive to share information, control output, and stabilize oil prices at artificially inflated levels, so too do the Defendants. The market conditions for crude oil sold in the U.S. are susceptible to collusion because it, and the downstream products for which it is produced, is a daily-use commodity that has no substitute for many purchasers and high switching costs for the remainder, leading to highly inelastic demand. Inelastic demand allows producer cartels to extract monopoly rents from customers who have few options to avoid price increases. "That a cartel [OPEC] controls the majority of global output, in and of itself, suggests that the relevant market may be susceptible to coordination." FTC Compl. ¶ 21.

### 3.     The Defendants acted against their economic self-interest.

67.     The Defendants acted against their economic self-interest by declining to ramp up production in the face of high crude oil prices. Typically, and consistent with their historical pre-

conspiracy practice, the Defendants faced strong individual incentives to increase their production so as to capture market share, particularly as crude oil prices rose. Their decisions not to increase production are economically rational only if made in a context of mutual commitments among themselves to constrain production. That much smaller U.S. shale oil producers seized on high prices to increase production around 2022 stands in stark contrast to the Defendants, who at the same time refused to "budg[e] on production restraint vows as oil markets surge[d]." *See* Liz Hampton, "U.S. shale oil forecasts keep rising as smaller producers lead the way," *Reuters* (March 2, 2022).

68.     The Wall Street Investor Co-Conspirators similarly acted against their economic self-interest by pressuring their respective investment companies – the Defendants – to stop seizing market share from OPEC, OPEC+ countries, and each other and instead focus on slowing total production so as to supra-competitively inflate crude oil and light petroleum product prices.

### 4.     There was a high degree of communication between and among the Defendants and their co-conspirators.

69.     As described above, *supra* ¶¶ 43–59, the Defendants were engaged in extensive communications with OPEC, OPEC+, the Wall Street Investor Co-Conspirators, and amongst each other, including at conferences like CERAWeek and the World Petroleum Congress, on industry panels, and in informal settings where they routinely and privately communicated with each other about sensitive topics, including projected oil output.

70.     Without discovery, the Plaintiff cannot know who attended each closed-door meeting, how many meetings there were, what precisely was discussed at any meetings, or any documents pertaining to any of those meetings. But based on the Plaintiff's assessment, attendees of these meetings included the following:

| Name | Title | Affiliation |
|------|-------|-------------|
| Unknown | | Anadarko |
| Dell'Osso, Nick | CEO | Chesapeake |
| Lawler, Robert | CEO | Chesapeake |
| Leach, Tim | CEO | Concho Resources Inc. |
| Unknown | | ConocoPhillips |
| Muncrief, Rick | CEO | Devon Energy |
| Stice, Travis | CEO | Diamondback |
| Papa, Mark | CEO | EOG; Centennial Resources Development Inc. (now Permian) |
| Rice, Toby | CEO | EQT Corp. |
| Obiang Lima, Gabriel | Minister of Mines and Hydrocarbons | Equatorial Guinea |
| Miller, Jeff | President | Halliburton Co. |
| Hess, John | CEO | Hess Corp. |
| Unknown | | Hunt Energy |
| Unknown | | Newfield Exploration |
| Hollub, Vicki | CEO | Occidental |
| Al Ghais, Haitham | Secretary General | OPEC |
| Al-Qahtani, Ayed | Research Director | OPEC |
| Barkindo, Mohammad | Secretary General | OPEC |
| Dove, Tim | CEO | Pioneer |
| Sheffield, Scott | CEO | Pioneer |
| Saleh Al Sada, Mohammed | Minister of Energy and Industry | Qatar |
| Al Mazrouei, Suhail | Minister of Energy | United Arab Emirates |
| Unknown | | Various hedge funds, asset managers, and institutional investors |
| Unknown | | Vincent Energy |

**5.    The Defendants are owned by the same investors, making the U.S. shale oil industry even more prone to collusion.**

71.    The Defendants' investor owners are largely common to each other. The

Defendants' largest shareholders over the last few years have all been many of the same entities

(the exception is Continental, which founder Howard Hamm took private in 2022):

| Permian | Chesapeake | Diamondback | EOG | Hess | Occidental | Pioneer |
|---------|-----------|-------------|-----|------|------------|---------|
| BlackRock, Inc. | BlackRock, Inc. | BlackRock, Inc. | BlackRock, Inc. | BlackRock, Inc. | BlackRock, Inc. | BlackRock, Inc. |
| Capital World Investors | Capital World Investors | Capital World Investors | Capital World Investors | | | Capital World Investors |
| FMR LLC (Fidelity) | FMR LLC (Fidelity) | FMR LLC (Fidelity) | | FMR LLC (Fidelity) | | |
| State Street Corp. | State Street Corp. | State Street Corp. | State Street Corp. | State Street Corp. | State Street Corp. | State Street Corp. |
| T. Rowe Price | T. Rowe Price | | | T. Rowe Price | | T. Rowe Price |
| Vanguard Group Inc. | Vanguard Group Inc. | Vanguard Group Inc. | Vanguard Group Inc. | Vanguard Group Inc. | Vanguard Group Inc. | Vanguard Group Inc. |

72.     In addition to these larger asset manager investors are hedge funds that own substantial stakes in some of the Defendants and claim expertise in the energy industry.

73.     The fact of the Defendants' common investor ownership creates an additional factor indicating that the Defendants agreed to restrict output.

74.     First, because the Defendants were largely owned by many of the same investors, OPEC's direct communications with investors – which supplemented OPEC's direct communications with the Defendants themselves – often served as yet another mechanism to communicate and coordinate with the whole group of Defendants via their proxies (the investors). *See supra* ¶¶ 48, 52, 54 (discussing how over the course of years OPEC met with various investors).

75.     Second, the investors' participation in the relationship between the Defendants and OPEC served as an enforcement mechanism for the agreement to restrict output. The investors' expressed concerns about output – or "capital discipline," in Wall Street-speak – became a stick used to ensure that the Defendants adhered to their agreement and its goals. In 2021, Sheffield described this state of affairs as: "[e]verybody's going to be disciplined,

regardless whether it's $75 Brent, $80 Brent, or $100 Brent," because "[a]ll the shareholders that I've talked to said that if anybody goes back to growth, *they will punish those companies*." *See* Derek Brower and David Sheppard, "US shale drillers cannot contain oil price rise, Pioneer boss says," *Financial Times* (Oct. 3, 2021) (emphasis added).

76.     Third, the Defendants' common investor ownership creates a horizontal shareholding dynamic that indicates an agreement not to compete. When competitors in an industry are all largely owned by the same relatively small group of owners, "[e]conomic theory has long shown that horizontal shareholdings can reduce the incentives of horizontal competitors to compete with each other." *See* Einer Elhauge, "Horizontal Shareholding," 129 Harv. L. Rev. 1267, 1268 (March 2016). This is because a producer maximizes its profits by competing only when the profits it makes from taking market share away from competitors outweighs its interest in keeping market-wide prices high; when ownership is separate, "economic models prove that firms have incentives to undercut each others' prices because the profits they gain from the additional sales exceed the price reduction caused by their own conduct." *Id.* at 1269. The premise on which these models rest is "that when a firm takes away sales by undercutting its rivals' prices, the firm's owners gain the profits from those sales but lose no profit on the sales taken away from their rivals." *Id.* at 1269.

77.     But when ownership is *not* separate – meaning the owner of a producer also owns that producer's competitors – then a producer that cuts its price lower than its rivals' price "simply moves their owners' money from one pocket to another; the net effect of the price cut for those owners is that the prices charged by both firms are lower, thus lowering those owners' profits across both firms." *Id.* at 1269.

28

78.     The Defendants' investors had no interest in any particular Defendant winning market share from any other Defendant by increasing output. Instead, because of the investors' horizontal shareholding across Defendants, the investors' interest was in keeping market-wide crude oil and light petroleum product prices high, accomplished by restricting output in coordination with OPEC. *Id.* at 1274 ("The basic anticompetitive effects arise from the fact that interlocking shareholdings diminish each individual firm's incentives to cut prices or expand output by increasing the costs of taking away sales from rivals.").

## III.   THE DEFENDANTS' CONSPIRACY TO DRIVE UP THE PRICE OF CRUDE OIL VIOLATES THE ANTITRUST LAWS.

### A.     It is a per se violation of the antitrust laws for the Defendants to collude to drive up the price of crude oil.

79.     The Defendants' conduct constitutes a *per se* violation of the antitrust laws. "Types of agreements that have been held per se illegal include agreements among competitors to fix prices or output, rig bids, or share or divide markets by allocating customers, suppliers, territories, or lines of commerce." *See* Federal Trade Commission and the U.S. Department of Justice, "Antitrust Guidelines for Collaborations Among Competitors," at 8 (April 2000). The Defendants' conduct represents concerted action amongst a group of horizontal competitors to restrict output so as to artificially inflate the price of crude oil to benefit the horizontal competitors – producers of that oil – at the expense of consumers of crude oil and light petroleum products.

80.     The Defendants' scheme directly impacted the crude oil market and the light petroleum product market, which is intertwined with the crude oil market.

81.     The Defendants are considered horizontal competitors as producers of crude oil in the U.S. crude oil market. They are expected to compete against each other when selling their crude oil.

82.     Instead of competing, however, the Defendants, OPEC, OPEC+, and the Wall Street Investor Co-Conspirators agreed to restrain trade to pursue collective goals and to manipulate the market by collusion and coordination. This collusive output restriction was inimical to competition and restrained trade in the crude oil market and the light petroleum product market.

83.     Courts have developed substantial experience with the type of restraint at issue here, involving restriction of output of a commodity product. In those cases, courts have recognized that there are no redeeming pro-competitive benefits to the type of output restriction alleged by the Plaintiff. Thus, courts can predict with confidence that the type of restraint identified here – a group of horizontal competitors agreeing to restrict output so as to inflate the price of a commodity to supra-competitively high levels – would be invalidated in all or almost all instances.

**B.      Under a quick look or rule of reason analysis, the Defendants' conduct violates the antitrust laws.**

84.     The Defendants' conduct also constitutes unlawful information sharing that violates the antitrust laws under a quick look or rule of reason analysis. The anticompetitive effects of Defendants' information sharing was to artificially inflate the price of crude oil and light petroleum products.

1. **The relevant antitrust markets are the U.S. market for the development, production, and sale of crude oil and the U.S. market for light petroleum products.**

85.     A relevant product market in which to assess the Defendants' anticompetitive information sharing is the development, production, and sale of crude oil. Another relevant product market in which to assess the Defendants' anticompetitive information sharing is the market for light petroleum products. Crude oil is the main input to produce light petroleum products, including gasoline, diesel fuel, heating oil, and jet fuel. Crude oil purchasers and light petroleum product purchasers generally cannot switch to alternative commodities without facing substantial costs.

86.     A relevant geographic market in which to analyze the Defendants' anticompetitive information sharing for both product markets is the United States.

2. **The Defendants and their co-conspirators possess market power in the U.S. crude oil market.**

87.     OPEC alone has market power. This is reflected in its ability to directly impact global crude oil prices, which it has had the ability to do since the 1970s. *See* Federal Trade Commission Bureau of Economics, "The Petroleum Industry: Mergers, Structural Change, and Antitrust Enforcement," at 136 (Aug. 2004). It is also reflected in the fact that OPEC member countries produce about 40% of the world's crude oil and export about 60% of total petroleum traded internationally; "[b]ecause of this market share, OPEC's actions can, and do, influence international oil prices." *See* U.S. Energy Information Administration, "What Drives Crude Oil Prices?" (2024).

88.     OPEC and OPEC+ have market power. "OPEC and OPEC+ countries combined produced about 59% of global oil production, 48 million [barrels per day] in 2022, and so

influence global oil market balances and oil prices now more than ever." *See* U.S. Energy

Information Administration, "What is OPEC+ and how is it different from OPEC?" (updated:

July 3, 2023).

89.     OPEC, OPEC+, and the Defendants have overwhelming market power. Together,

these entities have the ability to control U.S. crude oil prices and U.S. light petroleum product

prices, and they control of the majority of global crude oil production.

### 3.     The Defendants' conduct has anticompetitive effects, including supra-competitive prices.

90.     The principal anticompetitive effects of the Defendants' unlawful information

sharing practices are supra-competitively high crude oil and light petroleum product prices. *See*

*infra* ¶¶ 98 (price chart). These effects outweigh any potential procompetitive benefits that the

Defendants can be expected to identify from their information sharing practices. Any

procompetitive efficiencies the Defendants can be expected to identify could be reasonably

achieved through less anticompetitive means.

### 4.     The crude oil market is susceptible to the exercise of market power.

91.     Several features of the U.S. crude oil market and the U.S. light petroleum product

market demonstrate that they are susceptible to the exercise of market power by the Defendants

and their co-conspirators.

92.     First, the global crude oil market is concentrated. Because the production of crude

oil requires significant capital, resources, and regulatory approvals, new entrants are rare.

93.     Second, the fungibility analysis asks whether the markets are susceptible to the

exercise of the Defendants' market power through coordination. It is harder for a cartel to

establish and police a price conspiracy when the products are heterogenous and difficult to

compare to each other. Crude oil is a quintessential commodity, and the existence of OPEC – a global oil cartel – has been a critical feature of the global crude oil market for decades. This market structure facilitates the Defendants' establishment and policing of an output conspiracy. The Defendants who produce shale oil in a manner contrary to the other Defendants (and their co-conspirators) are easily detected because their divergent output is revealed publicly in global oil pricing behavior to the other Defendants.

94.     Third, demand for crude oil and light petroleum products is inelastic. It is not economically or practically feasible for clients to abstain or switch from using crude oil or light petroleum products. A municipality like the Plaintiff cannot realistically switch, for example, from a fleet of vehicles powered by gasoline to a fleet of vehicles powered by electricity in response to price increases.

### 5.     The antitrust laws prohibit the Defendants' exchange of current and future output information.

95.     The Defendants' information-sharing has all the features indicative of a naked restraint on competition that can be condemned without further inquiry and that is unlawful under a quick look analysis or the rule of reason.

a.     That the Defendants are horizontal competitors sharing output information shows that the nature of the information exchange weighs in favor of it being anticompetitive.

b.     That the Defendants' information sharing was done privately, without formal controls, and in a way designed to avoid detection shows that the nature of the information exchange weighs in favor of it being anticompetitive.

c.       That the Defendants' information sharing involved exchanges of future output information and the incorporation of purportedly private output shows that the nature of the information exchange weighs in favor of it being anticompetitive.

d.       That the Defendants' information sharing involves specific output information pertaining to a specific product (crude oil) – as opposed to generalized information sharing of overall market trends or the like – shows that the nature of the information exchange weighs in favor of this arrangement being anticompetitive.

e.       That the Defendants' information sharing did not involve publicly available information, and instead involved the sharing of each producer's proprietary view of appropriate output shows that the nature of the information exchange weighs in favor of it being anticompetitive.

f.       That the Defendants' information sharing happened, among other places, in dinner meetings that are private, not open to the public, and that do not have fulsome descriptions of what was discussed at those meetings shows that the nature of the information exchange weighs in favor of it being anticompetitive.

## IV.     THE PLAINTIFF WAS INJURED AS A RESULT OF THE DEFENDANTS' CONSPIRACY.

96.     Retail buyers typically purchase light petroleum products at a gas station or a truck stop. Non-retail buyers, however, typically purchase light petroleum products in what are called "rack sales," meaning wholesale truckload sales (or smaller) where title transfers at a terminal. *See* U.S. Energy Information Administration, "Glossary" (defining "rack sales"). These rack purchases are made along a fuel distribution system, and the purchases are often made from

wholesalers (or "marketers") and governed by a contract that incorporates a benchmark price, adding taxes, fees, and freight and transportation costs.

97.     The Plaintiff purchased light petroleum products in a rack sale, from a wholesale supplier. The prices paid for those products are directly impacted by the price of crude oil. Increases in the price of crude oil increase the price of gasoline, diesel fuel, heating oil, and jet fuel (i.e., light petroleum products).

98.     Especially when compared with the price war between 2014 and 2016, the Defendants' agreement to coordinate and restrict output in alignment with OPEC and OPEC+ caused supracompetitive inflation in crude oil prices. This is reflected in the West Texas Intermediate, the price at which crude oil is traded in the spot market in Cushing, Oklahoma and the most commonly referenced price benchmark in the United States for crude oil:



99.     This inflation in the price of crude oil caused a direct, arithmetic impact on the price of light petroleum products. "Crude oil makes up the largest cost of transportation fuels. Increases in crude oil prices will lead Americans to pay higher gasoline and diesel fuel prices at the pump and bear the burden of greater heating oil and jet fuel costs." *See* FTC Compl. ¶ 8 (emphasis added).

100.    For example, the price of crude oil represents 55% of the final price of a gallon of gasoline and 39% of the final price for a gallon of diesel, with the remainder being attributed to taxes, distribution and marketing costs, and refining costs:



101.    Increases in the price of crude oil thus necessarily cause increases in the price of light petroleum products. Using a regression analysis, regulators have found that "the variation in the price of crude oil explains approximately 85% of the variation in the price of gasoline." *See* Federal Trade Commission Bureau of Economics, "The Petroleum Industry: Mergers, Structural Change, and Antitrust Enforcement," at 1, n.1 (Aug. 2004).

## CLASS ACTION ALLEGATIONS

102.    The Plaintiff brings this action on behalf of itself and all others similarly situated

as a class action under Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(2), as a

representative of a "nationwide Class" seeking injunctive relief. The nationwide Class is defined

as:

> All persons and entities who, between January 1, 2021 and the cessation of the
> Defendants' unlawful conduct, purchased light petroleum products (motor
> gasoline, distillate fuel, and jet fuel) in a rack sale in the United States and not for
> resale.

103.    The Plaintiff also brings this action on behalf of itself and all others similarly

situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), as a

representative of a "repealer Class" seeking damages and injunctive relief. The repealer Class is

defined as:

> All persons and entities who, between January 1, 2021 and the cessation of the
> Defendants' unlawful conduct, purchased light petroleum products (motor
> gasoline, distillate fuel, and jet fuel) in a rack sale in a repealer jurisdiction and
> not for resale. A "repealer" jurisdiction means any of the following: Alabama,
> Arizona, California, Colorado, Connecticut, the District of Columbia, Florida,
> Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota,
> Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North
> Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah,
> or Vermont.

104.    Excluded from both Classes are: the Defendants; the officers, directors, or

employees of any Defendant; any entity in which any Defendant has a controlling interest; any

affiliate or assign of any Defendant; any co-conspirator of the Defendants; the federal

government and its entities; any judicial officer presiding over this action and the members of

their immediate families and judicial staff; and any juror assigned to this action.

105.     Both Classes are so numerous as to make joinder impracticable. The Plaintiff does not know the exact number of class members but the above-defined classes are readily identifiable and are ones for which records should exist. The Plaintiff believes that due to the nature of the product market, there are at least thousands of members of both classes in the United States.

106.     Common questions of law and fact exist as to all members of both classes. The Plaintiff and both classes were injured by the same unlawful price-fixing conspiracy, and the Defendants' anticompetitive conduct was generally applicable to all the members of the Classes, and relief to both classes as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

- Whether the Defendants engaged in a conspiracy to restrict the production of crude oil, and the facts showing that conspiracy;

- Whether the conspiracy violated the antitrust and consumer protection laws of various states;

- Whether and to what extent the Plaintiff and the other Class members were injured by the Defendants' conduct;

- What the measure of damages should be for the Plaintiff and the other Class members; and

- What injunctive relief should be imposed to restore competition in the U.S. markets for crude oil and light petroleum products.

107.     The Plaintiff's claims are typical of the claims of Class members, and the Plaintiff will fairly and adequately protect the interests of both Classes. The Plaintiff and all members of both Classes are similarly impacted by Defendants' unlawful conduct in that they paid artificially inflated prices for light petroleum products sold in the U.S., resulting from output restrictions in the crude oil market by cartel members.

108.    The Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. The Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Classes.

109.    The Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

110.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including issues relating to liability and damages.

111.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

## CLAIMS FOR RELIEF

## COUNT 1 – SHERMAN ACT

**Conspiracy to Restrain Trade in Violation of the Sherman Act, 15 U.S.C. § 1,
and the Clayton Act, 15 U.S.C. § 15
(Against All Defendants)**

112.    The Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

113.    The Defendants and their co-conspirators entered into and engaged in a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

114.    During the class period, the Defendants agreed to reduce competition amongst themselves by restricting output and fixing prices.

115.    The conspiracy is a *per se* violation of Section 1 of the Sherman Act.

116.    Alternatively, the conspiracy resulted in substantial anticompetitive effects in the crude oil market and the light petroleum product market. There is no legitimate business justification for, or pro-competitive benefits from, the Defendants' conduct.

117.    The Plaintiff and members of the nationwide Class are entitled to an injunction against the Defendants preventing and restraining further violations, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

### VIOLATION OF STATE ANTITRUST, UNFAIR COMPETITION, AND CONSUMER PROTECTION LAWS

118.    The Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

119.    The Plaintiff and the members of the repealer Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

## COUNT 2 – ALABAMA

120.    Due to the Defendants' unlawful conduct, (1) competition for crude oil and light petroleum products was restrained, suppressed, and eliminated within Alabama; (2) light petroleum product prices in the State of Alabama were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. The Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of Ala. Code § 6-5-60 *et seq*. The Defendants' conspiracy substantially affected Alabama commerce and accordingly, the Plaintiff and the members of the Class seek all forms of relief available under Ala. Code § 6-5-60 *et seq*.

## COUNTS 3 & 4 – ARIZONA

121.    The Defendants' conspiracies had the following effects: (1) price competition for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout Arizona; (2) prices of light petroleum products in the State of Arizona were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the class period, Defendants' illegal conduct substantially affected Arizona commerce.

122.    The Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of Ariz. Rev. Stat. § 44-1401 *et seq.* Accordingly, Plaintiff and members of the Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401 *et seq.*

123.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1521 *et seq.*, and, accordingly, the Plaintiff and members of the Class seek all relief available under that statute.

## COUNT 5 & 6 – CALIFORNIA

124.    The Defendants' conspiracies had the following effects: (1) price competition for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout California; (2) light petroleum product prices in the State of California were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

125.    During the class period, the Defendants' illegal conduct substantially affected California commerce and consumers.

126.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code § 16700 *et seq.* During the class period, the Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce.

127.    Each Defendant has acted in violation of Cal. Bus. & Prof. Code § 16720 to fix, reduce, stabilize, and maintain crude oil production. The violations of Cal. Bus. & Prof. Code § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, reduce, maintain, and stabilize the production of crude oil. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the prices of crude oil and light petroleum products. As a result of the Defendants' violation of Cal. Bus. &

Prof. Code § 16720, the Plaintiff and members of the Class seek treble damages and their cost of

suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code § 16750(a).

128.    The Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*, and, accordingly, the Plaintiff

and members of the Class seek all relief available under that statute.

## COUNTS 7 & 8 – COLORADO

129.    The Defendants' conspiracies had the following effects: (1) price competition for

crude oil and light petroleum products was restrained, suppressed, and eliminated throughout

Colorado; (2) light petroleum product prices in the State of Colorado were raised, fixed,

maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free

and open competition. During the class period, Defendants' illegal conduct substantially affected

Colorado commerce and consumers. The Defendants have violated Colo. Rev. Stat. §6-4-101 *et*

*seq.* Accordingly, Plaintiff and members of the Class seek all forms of relief available under

violated Colo. Rev. Stat. §6-4-101, *et seq.*

130.    The Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of Colo. Rev. Stat. §6-1-101 *et seq.* and, accordingly, the Plaintiff and

members of the Class seek all relief available under that statute.

## COUNT 9 – CONNECTICUT

131.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of Conn. Gen. Stat. §35-24 *et seq.* Defendants' combinations or conspiracies had the

following effects: The Defendants' conspiracies had the following effects: (1) price competition

for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout

Connecticut; (2) light petroleum product prices in the State of Connecticut were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the class period, the Defendants' illegal conduct substantially affected Connecticut commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq.* Accordingly, the Plaintiff and members of the Class seek all forms of relief available under Conn. Gen. Stat. §35-24 *et seq.*

## COUNTS 10 & 11 – DISTRICT OF COLUMBIA

132.    The Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout the District of Columbia; (2) light petroleum product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) the Plaintiff and members of the Class, including those who resided in the District of Columbia and purchased light petroleum products in the District of Columbia, paid supracompetitive, artificially inflated prices for gasoline and/or diesel fuel. During the class period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

133.    The Defendants have entered into agreements in restraint of trade in violation of D.C. Code § 28-4501 *et seq.* Accordingly, the Plaintiff and members of the Class seek all forms of relief available under D.C. Code § 28-4501 *et seq.*

134.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code, §28-3901 *et seq.*, and, accordingly, the Plaintiff and members of the Class seek all relief available under that statute.

44

## COUNTS 12 & 13 – FLORIDA

135.    Through their actions and actions of co-conspirators, crude oil and light petroleum product prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring the Plaintiff and the Class. Throughout the class period, competition in the light petroleum product market was restrained, suppressed, and eliminated throughout Florida.

136.    The Plaintiff and members of the Class, including those who purchased light petroleum products in the State of Florida, paid supracompetitive, artificially inflated prices for those products.

137.    During the class period, the Defendants' illegal conduct substantially affected commerce in Florida. The Defendants have violated Fla. Stat. § 542.15 *et seq.*, through their anticompetitive actions. Accordingly, the Plaintiff and members of the Class seek all forms of relief available under Fla. Stat. § 542.15 *et seq.*

138.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201 *et seq.*, and, accordingly, the Plaintiff and members of the Class seek all relief available under that statute.

## COUNT 14 – HAWAII

139.    The Defendants have violated Haw. Rev. Stat. Ann. §480-1 *et seq.*, through their actions. See Haw. Rev. Stat. §§ 480-4, 480-13. Through the Defendants' actions and the actions of their co-conspirators, light petroleum product prices in the State of Hawaii were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiff and the Class.

140.     Throughout the class period, price competition for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout the State of Hawaii. The Plaintiff and members of the Class, including those who resided in the State of Hawaii and purchased gasoline or diesel fuel in Hawaii, paid supracompetitive, artificially inflated prices for their light petroleum products. During the class period, the Defendants' illegal conduct substantially affected commerce in Hawaii.

141.     Accordingly, the Plaintiff and members of the Class seek all forms of relief available under Haw. Rev. Stat. § 480-1 *et seq.*

## COUNTS 15 & 16 – ILLINOIS

142.     The Defendants' combinations or conspiracies had the following effects: (1) price competition in the crude oil and light petroleum product markets was restrained, suppressed, and eliminated throughout the State of Illinois, and (2) light petroleum product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Illinois. During the class period, the Defendants' illegal conduct substantially affected Illinois commerce.

143.     The Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1 *et seq.* Accordingly, the Plaintiff and members of the Class seek all forms of relief available under 740 Ill. Comp. Stat. 10/1 *et seq.*

144.     The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1 et seq, and 720 Ill. Comp. Stat. 295/1a, and, accordingly, the Plaintiff and members of the Class seek all relief available under that statute.

## COUNT 17 – IOWA

145.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1 *et seq.* The Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) light petroleum product prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. During the class period, the Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Iowa Code § 553.1 *et seq.* Accordingly, the Plaintiff and members of the Class seek all forms of relief available under Iowa Code § 553.1 *et seq.*

## COUNT 18 – KANSAS

146.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. § 50-101 *et seq.* The Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout the State of Kansas; (2) light petroleum product prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the class period, the Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, the Plaintiff and members of the Class seek all forms of relief available under Kan. Stat. § 50-101 *et seq.*

## COUNT 19 – MAINE

147.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Stat. tit. 10, § 1101. The Defendants' combinations or conspiracies had the

following effects: (1) price competition for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout the State of Maine; and (2) light petroleum product prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels. During the class period, The Defendants' illegal conduct substantially affected Maine commerce. Accordingly, the Plaintiff and members of the Class seek all relief available under Me. Stat. tit. 10, §1104.

## COUNTS 20 & 21 – MARYLAND

148.    The Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Maryland for crude oil and light petroleum products by restraining, suppressing, and eliminating competition. Further, the Defendants' unlawful conduct raised, fixed, maintained, and stabilized light petroleum product prices in the State of Maryland at artificially high levels. During the class period, the Defendants' illegal conduct substantially affected Maryland commerce.

149.    The Defendants violated the Md. Code, Com. Law § 11-201 *et seq.*, by entering into an unlawful agreement in restraint of trade in the State of Maryland. Accordingly, the Plaintiff and members of the Class seek all relief available under Md. Code, Com. Law § 11-201 *et seq.*

150.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Code, Com. Law § 13-101 *et seq.*, and, accordingly, the Plaintiff and members of the Class seek all relief available under that statute.

**COUNTS 22 & 23 – MICHIGAN**

151.    The Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout the State of Michigan, and (2) light petroleum product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Michigan. During the class period, the Defendants' illegal conduct substantially affected Michigan commerce.

152.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws § 445.771 *et seq.* Accordingly, Plaintiff and members of the Class seek all relief available under Mich. Comp. Laws § 445.771 *et seq.*

153.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws § 445.903 *et seq.*, and, accordingly, the Plaintiff and members of the Class seek all relief available under that statute.

**COUNTS 24 & 25 – MINNESOTA**

154.    Through their actions and actions of co-conspirators, light petroleum product prices in the State of Minnesota were raised, fixed, maintained, and stabilized at an artificially high level, thereby injuring the Plaintiff and the Class. Throughout the class period, price competition in the market for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout the State of Minnesota. The Plaintiff and members of the Class, including those who resided in the State of Minnesota and purchased light petroleum product prices there, paid supracompetitive, artificially inflated prices for those products. During the

class period, the Defendants' illegal conduct substantially affected commerce in the State of Minnesota.

155.    The Defendants have violated the Minn. Stat. § 325D.49 *et seq.*, through their anticompetitive actions. Accordingly, the Plaintiff and members of the Class seek all forms of relief available under Minn. Stat. § 325D.49 *et seq.*

156.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation Minn. Stat. § 325d.43-48 *et seq.*, and, accordingly, the Plaintiff and members of the Class seek all relief available under that statute.

### COUNT 26 – MISSISSIPPI

157.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code § 75-21-1 *et seq. See* Miss. Code Ann. § 75-57-63. The Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout the State of Mississippi, and (2) light petroleum product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Mississippi. During the class period, the Defendants' illegal conduct substantially affected the State of Mississippi commerce. Accordingly, the Plaintiff and members of the Class seek all relief available under Miss. Code § 75-21-1 *et seq.*, and Miss. Code § 75-57-63.

### COUNTS 27 & 28 – NEBRASKA

158.    The Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout the State of Nebraska, and (2) light petroleum product prices were raised,

fixed, maintained, and stabilized at artificially high levels throughout the State of Nebraska. During the class period, the Defendants' illegal conduct substantially affected the State of Nebraska commerce.

159.    The Defendants restrained trade and commerce in the State of Nebraska by entering into an unlawful agreement in violation of Neb. Rev. Stat. § 59-801 *et seq.* Accordingly, Plaintiff and members of the Class seek all relief available under Neb. Rev. Stat. § 59-801 *et seq.*

160.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §59-1601 *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## COUNTS 29 & 30 – NEVADA

161.    The Defendants' conspiracies had the following effects: (1) price competition for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout the State of Nevada; (2) light petroleum product prices in the State of Nevada were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

162.    The Defendants violated the Nev. Rev. Stat. § 598A.210 *et seq.*, by entering into unlawful agreement in restraint of trade in the State of Nevada. As a result of the Defendants' violation of Nev. Rev. Stat. Ann. § 598A.210 *et seq.* The Plaintiff and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Nev. Rev. Stat. Ann. § 598A.210.

163.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903 *et seq.*, and, accordingly, the Plaintiff and members of the Class seek all relief available under that statute.

### COUNTS 31 & 32 – NEW HAMPSHIRE

164.    The Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Hampshire crude oil and light petroleum products market by restraining, suppressing, and eliminating competition. Further, the Defendants' unlawful conduct raised, fixed, maintained, and stabilized light petroleum product prices in the State of New Hampshire at artificially high levels. During the class period, the Defendants' illegal conduct substantially affected the State of New Hampshire commerce.

165.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. Rev. Stat. § 356:1 *et seq.* Accordingly, the Plaintiff and members of the Class seek all relief available under N.H. Rev. Stat. § 356:1 *et seq.*

166.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. §358-A:1 *et seq.*, and, accordingly, the Plaintiff and members of the Class seek all relief available under that statute.

### COUNTS 33 & 34 – NEW MEXICO

167.    The Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Mexico for crude oil and light petroleum products by restraining, suppressing, and eliminating competition. Further, the Defendants' unlawful conduct raised, fixed, maintained and stabilized light petroleum product prices in the State of New

Mexico at artificially high levels. During the class period, the Defendants' illegal conduct substantially affected commerce in the State of New Mexico.

168.    The Defendants violated the N.M. Stat. § 57-1-1 *et seq.*, by entering into unlawful agreement in restraint of trade in the State of New Mexico. Accordingly, the Plaintiff and members of the Class seek all relief available under N.M. Stat. § 57-1-1 *et seq.*

169.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. § 57-12-1 *et seq.*, and, accordingly, the Plaintiff and members of the Class seek all relief available under that statute.

### COUNT 35 – NEW YORK

170.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. Gen. Bus. Law § 340 *et seq.* The Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout the State of New York, and (2) light petroleum product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of New York. During the class period, Defendants' illegal conduct substantially affected the State of New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340 *et seq.* Accordingly, the Plaintiff and members of the Class seek all relief available under N.Y. Gen. Bus. Law § 340 *et seq.*

### COUNT 36 – NORTH CAROLINA

171.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. Gen. Stat. § 75-1 *et seq.* The Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for crude oil and light petroleum products

was restrained, suppressed, and eliminated throughout the State of North Carolina, and (2) light petroleum product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of North Carolina. During the class period, the Defendants' illegal conduct substantially affected the State of North Carolina commerce. Accordingly, the Plaintiff and members of the Class seek all relief available under N.C. Gen. Stat. § 75-1 *et seq.*

## COUNT 37 – NORTH DAKOTA

172.     The Defendants' actions have violated the N.D. Cent. Code § 51-08.1-01 *et seq.* through their anticompetitive actions. Through their actions and actions of co-conspirators, light petroleum product prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiff and the Class. Throughout the class period, price competition in the market for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout the State of North Dakota. The Plaintiff and members of the Class, including those who resided in the State of North Dakota and purchased light petroleum products there, paid supracompetitive, artificially inflated prices. During the class period, the Defendants' illegal conduct substantially affected commerce in the State of North Dakota. Accordingly, the Plaintiff and members of the Class seek all forms of relief available under N.D. Cent. Code § 51-08.1-01 *et seq.*

## COUNTS 38 & 39 – OREGON

173.     The Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout the State of Oregon; (2) light petroleum product prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3)

individuals have been deprived of free and open competition. During the class period, the Defendants' illegal conduct substantially affected commerce in the State of Oregon. The Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725 *et seq.* Accordingly, the Plaintiff and members of the Class seek all forms of relief available under Or. Rev. Stat. § 646.725 *et seq.*

174.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605 *et seq.*, and accordingly, the Plaintiff and members of the Class seek all relief available under that statute.

### COUNTS 30 & 41 – RHODE ISLAND

175.    The Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Rhode Island for the crude oil and light petroleum product markets by restraining, suppressing, and eliminating competition. The Defendants' unlawful conduct raised, fixed, maintained, and stabilized crude oil and light petroleum product prices in the State of Rhode Island at artificially high levels. During the class period, the Defendants' illegal conduct substantially affected commerce in the State of Rhode Island.

176.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. Gen. Laws § 6-36-7 *et seq.* Accordingly, the Plaintiff and members of the Class seek all relief available under R.I. Gen. Laws § 6-36-7 *et seq.*

177.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws § 6-13.1-1, and, accordingly, the Plaintiff and members of the Class seek all relief available under that statute.

## COUNTS 42 & 43 – SOUTH DAKOTA

178.     Through their actions and actions of co-conspirators, crude oil and light petroleum

product prices in the State of South Dakota were raised, fixed, maintained, and stabilized at

artificially high level, thereby injuring Plaintiff and the Class. Throughout the class period, price

competition in the market for crude oil and light petroleum products was restrained, suppressed,

and eliminated throughout the State of South Dakota. During the class period, the Defendants'

illegal conduct substantially affected commerce in the State of South Dakota. The Plaintiff and

members of the Class, including those who resided in the State of South Dakota and purchased

light petroleum products there, paid supracompetitive, artificially inflated prices.

179.     The Defendants have violated S.D. Codified Laws § 37-1-3.1 *et seq.*, through

their anticompetitive actions. Accordingly, the Plaintiff and members of the Class seek all forms

of relief available under S.D. Codified Laws § 37-1-3.1 *et seq.*

180.     The Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of S.D. Codified Laws § 37-24-1 *et seq.*, and accordingly, the Plaintiff and

members of the Class seek all relief available under that statute.

## COUNT 44 – TENNESSEE

181.     The Defendants have entered into an unlawful agreement in restraint of trade in

violation of Tenn. Code § 47-25-101 *et seq.* The Defendants' combinations or conspiracies had

the following effects: (1) price competition for the sale crude oil and light petroleum products

was restrained, suppressed, and eliminated throughout the State of Tennessee; (2) prices for light

petroleum products in the State of Tennessee were raised, fixed, maintained, and stabilized at

artificially high levels; and (3) individuals have been deprived of free and open competition.

During the class period, the Defendants' illegal conduct substantially affected commerce in the State of Tennessee. Accordingly, the Plaintiff and members of the Class seek all forms of relief available under Tenn. Code § 47-25-101 *et seq.*

## COUNT 45 – UTAH

182.    The Defendants violated Utah Code § 76-10-3101 *et seq.* by entering into unlawful agreement in restraint of trade in the State of Utah. Specifically, the Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Utah for crude oil and light petroleum products by restraining, suppressing, and eliminating competition. Further, the Defendants' unlawful conduct raised, fixed, maintained, and stabilized crude oil and light petroleum product prices in Utah at artificially high levels. During the class period, the Defendants' illegal conduct substantially affected commerce in the State of Utah. Accordingly, Plaintiff and Members of the Class seek all relief available under Utah Code § 76-10-3101 *et seq.*

## COUNT 46 – VERMONT

183.    The Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and light petroleum products was restrained, suppressed, and eliminated throughout the State of Vermont; (2) light petroleum product prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. The Defendants have entered into an unlawful agreement in restraint of trade in violation of Vt. Stat. tit. 9, § 2453 *et seq.* During the class period, Defendants' illegal conduct substantially affected commerce in the State of

Vermont. Accordingly, the Plaintiff and members of the Class seek all forms of relief available under Vt. Stat. tit. 9, § 2465 *et seq.*

## PRAYER FOR RELIEF

184.     WHEREFORE, the Plaintiff, on behalf of itself and the Classes of all others so similarly situated, respectfully requests that:

a.     The Court determine that this action may be maintained as a class action under Federal Rules of Civil Procedure 23(a) and (b)(3), appoint the Plaintiff as class representative and its counsel of record as class counsel, and direct that notice of this action be given to the Classes, once certified;

b.     The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by the Defendants and their co-conspirators be adjudged to have violated various state antitrust and competition laws as alleged above;

c.     The Court permanently enjoin and restrain the Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

d.     The Court enter judgment against the Defendants, jointly and severally, and in favor of the Plaintiff and members of the Classes for treble the amount of damages

sustained by the Plaintiff and the Classes as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

   e. The Court award the Plaintiff and members of the Classes such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

**DEMAND FOR JURY TRIAL**

185. The Plaintiff demands a jury trial for all issues so triable.

Date: August 23, 2024

By: / s / Brian McMath
Brian McMath – NM Bar #148105
Brian Moore – NM Bar #146721
NACHAWATI LAW GROUP
5489 Blair Road
Dallas, Texas 75231
bmcmath@ntrial.com
bmoore@ntrial.com
(214) 890-0711

Sara Gross
 Chief, Affirmative Litigation Division
BALTIMORE CITY LAW DEPARTMENT
100 N. Holliday Street, Suite 109
Baltimore, MD 21202
sara.gross@@baltimorecity.gov
(410) 396-3947

*Counsel for the Mayor and City Council of Baltimore*

*\* Pro hac vice forthcoming*

Michael Dell'Angelo\*
BERGER MONTAGUE PC
1818 Market Street
Suite 3600
Philadelphia, PA 19103
mdellangelo@bm.net
(215) 875-3080

Richard D. Schwartz\*
BERGER MONTAGUE PC
1720 W Division
Chicago, IL 60622
rschwartz@bm.net
(773) 257-0255

Adam Farra\*
Times Wang\*

FARRA & WANG PLLC
1300 I Street N.W., Suite 400E
Washington, D.C. 20005
afarra@farrawang.com
twang@farrawang.com
(202) 505-5990
(202) 505-6227

*Counsel for the Mayor and City Council of
Baltimore and for the proposed Classes*